UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 JUL 24  PM 1: 05

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA    )
                            )
v.                          )
                            )
ANTHONY SEAGROVES,          )
                            )
            Defendant.      )

Case No. 2:24-cr-00122-cr −1

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS AND DISMISS
(Doc. 31)

Defendant Anthony Seagroves is charged in a one-count Indictment with being a felon in possession of a firearm in violation 18 U.S.C. §§ 922(g)(1) and 924(a)(8). *See* Doc. 16. Defendant moves to dismiss the Indictment, arguing 18 U.S.C. § 922(g)(1) violates the Second Amendment under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (Doc. 30). He also moves to suppress the firearm and ammunition seized, contending the seizure of those items violated his Fourth Amendment rights. Without this evidence, he contends the Indictment must be dismissed for lack of admissible evidence. (Doc. 31.)

The government opposed Defendant's motions on May 19, 2025. (Docs. 32, 33.) The court heard arguments on June 26, 2025, at which point it denied Defendant's motion to dismiss the Indictment on Second Amendment grounds (Doc. 35) in light of the Second Circuit's decision in *Zherka v. Bondi*, 140 F.4th 68, 75 (2d Cir. June 9, 2025). It took the remaining pending motions to suppress and dismiss under advisement.

The government is represented by Assistant United States Attorney Jonathan Ophardt. Defendant is represented by Devin McLaughlin, Esq.

I.    **Factual and Procedural Background.**

The following facts are derived from the parties' briefing and Burlington Police Department ("BPD") Officer Julian Gonzalez's affidavit, as well as a video recording of the stop and an evidentiary hearing at which Officer Gonzalez testified.

Officer Gonzalez is a senior officer at the BPD, where he has been employed for six years. He graduated from the Vermont Police Academy's twenty-week program and has had field training thereafter, including forty hours of basic narcotics training through the Drug Enforcement Agency ("DEA"). He completed an eight-month assignment for BPD's detective bureau unit. He has also worked with BPD's emergency response unit. In the course of his experience, he has observed illegal drug users in the "high hundreds" and has participated in over five hundred drug abuse-related calls. He credibly testified that signs of an overdose may include uncontrollable muscle movements, pinpoint pupils, fidgeting, loss of consciousness, and foaming at the mouth.

On ten to twenty occasions, Officer Gonzalez has experienced vehicles pulling away from him while he was investigating a scene. In 2024, several months before this incident, Officer Gonzalez witnessed a fleeing vehicle with an operator who initially appeared unconscious, woke up, fled, and struck a BPD female officer. Officer Gonzalez credibly testified that reasons for vehicles fleeing law enforcement include impaired drivers, stolen vehicles, and evidence of criminal activity in the vehicle.

On October 14, 2024, at approximately 1:45 p.m., Officer Gonzalez was conducting a routine patrol in downtown Burlington in a fully marked police vehicle. While driving through the Fletcher Free Library parking lot, an area Officer Gonzalez "kn[e]w to be a common area for illegal crime and drug activity . . . from [his] own work experiences and observations, along with information provided by the public[,]" (Doc. 33-1 at 2, ¶ 1), he observed a blue sedan parked in the library parking lot with its engine running (the "blue sedan"). The front driver's side window of the blue sedan was partially rolled down, and its windows were fogged so that Officer Gonzalez could not see clearly inside it, although he could see several silhouettes and an individual in the driver's seat. As he approached the blue sedan, Officer Gonzalez observed multiple

occupants inside. The driver was slouched over in a forward position and appeared
unconscious with his head nearly touching the steering wheel. Officer Gonzalez believed
the operator might be overdosing or having a medical event. Other occupants also
appeared to be overdosing. He radioed dispatch with this information and stated he was
going to check the vehicle.

Thereafter, Officer Gonzalez parked his cruiser directly in front of the blue sedan.[1]
After exiting his vehicle, he placed a portable "Stop Stick" underneath the rear driver's
side tire, which has spikes to deflate a tire if a vehicle flees. He used the Stop Stick
because "in the last two . . . years [he] ha[s] encountered an increase of stolen vehicles
flee[ing] from [him]" and he was aware "of an increased volume of vehicles fleeing from
other officers in the Chittenden County area; [oftentimes] driving erratically and putting
the public in danger." *Id.* at ¶ 5. Officer Gonzalez requested backup after identifying a
third individual passed out in the left rear passenger seat. He radioed the Fire Department
for medical assistance.

After approaching the vehicle, Officer Gonzalez identified Defendant as the adult
male slumped over the steering wheel. The blue sedan was in gear and not in park
because its brake lights were on. Officer Gonzalez knocked on the front driver's side
window and shone a flashlight into the blue sedan.

Defendant was initially unresponsive. When he awoke, he appeared disoriented
and lethargic. Officer Gonzalez ordered Defendant to turn the vehicle off at least five
times before Defendant eventually complied. Defendant became belligerent, questioning
Officer Gonzalez's authority to check on his welfare. During this interaction, the
windows remained fogged so Officer Gonzalez could not see Defendant clearly. To
ensure Defendant was not preparing to flee or concealing a weapon, and for officer safety
concerns, Officer Gonzalez opened the driver's side door to get a better view. Defendant

---

[1] The vehicles were "nose to nose" with the intent that the police vehicle obstruct the blue
sedan's ability to leave. From the video, it appears there are several feet between the vehicles so
that the driver of the blue sedan could have fled by backing over a curb or making a sharp turn.
The court nonetheless finds Officer Gonzalez's parked police vehicle clearly impeded the blue
sedan's exit and the Stop Stick ensured that prolonged flight from the scene was impossible.

became increasingly agitated and confrontational and said, "You didn't have permission to open my car door." He complained that he was "coming back to," which Officer Gonzalez understood to mean that Defendant was awakening from a possible overdose.

Additional officers arrived on the scene. While Officer Gonzalez spoke with Defendant, another officer asked dispatch to run the blue sedan's license plate, which indicated the vehicle was stolen from South Burlington, Vermont.[2] At that point, Officer Gonzalez ordered Defendant to step out of the vehicle. He observed Defendant "to appear very nervous while making furtive movements and glancing around." *Id.* at 3, ¶ 6. Although he initially refused to comply, Defendant exited the blue sedan. It was determined that Defendant had a criminally suspended driver's license. After Defendant was outside the vehicle, Officer Gonzalez observed in plain view a black and green handgun lying on the seat Defendant had just left. The recovered firearm was a 9 mm caliber semi-automatic pistol containing a magazine loaded with four rounds of PMC brand 9 mm ammunition.

Defendant was arrested and subsequently charged in state court with: (1) violating his conditions of release on pending state charges, (2) operating a motor vehicle without consent, (3) driving with a criminally suspended license, and (4) being a person prohibited from possessing firearms. The Vermont Superior Court conditionally released Defendant.

On October 28, 2024, Defendant was charged in federal court with being a felon[3] in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8). A federal grand jury indicted Defendant on this charge on November 7, 2024.

---

[2] Officer Gonzalez credibly testified that whenever BPD locates a stolen vehicle, they contact the registered owner and conduct an inventory of the vehicle's contents.

[3] On May 28, 2019, Defendant was convicted in the Vermont Superior Court, Criminal Division, of burglary and was sentenced to serve one to six years.

## II.    Conclusions of Law and Analysis.

### A.    Standing.

Neither party addresses whether Defendant has standing to challenge a search and seizure of a stolen vehicle. "To claim an unconstitutional seizure, 'a party must first assert a possessory interest in an item seized.'" *Newsome v. Bogan*, 617 F. Supp. 3d 133, 146 (W.D.N.Y. 2022) (quoting *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997)).

In the context of the Fourth Amendment, standing "is not distinct from the merits and is more properly subsumed under substantive Fourth Amendment doctrine." *Byrd v. United States*, 584 U.S. 395, 410 (2018) (citation and internal quotation marks omitted). The Supreme Court has explained that references to property concepts, although not determinative, may aid courts in assessing whether a defendant has a reasonable expectation of privacy that confers standing. In *Byrd*, the Court determined that "[n]o matter the degree of possession and control, [a] car thief would not have a reasonable expectation of privacy in a stolen car." 584 U.S. at 409.

The details regarding Defendant's possession of the blue sedan are not before the court, other than the fact that the vehicle was stolen. As a result, the court cannot determine whether Defendant is a "car thief" precluded from asserting a Fourth Amendment claim pertaining to any search or seizure of the blue sedan, even if he remains entitled to assert a challenge to the seizure of his person.

### B.    Standard of Review.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has shown a basis for his [or her] motion, the burden shifts to the government to demonstrate that the search or seizure did not violate the Fourth Amendment." *United States v. Alleyne*, 573 F. Supp. 3d 861, 869 (E.D.N.Y. 2021) (internal citations and quotation marks omitted).

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996) (citations omitted). "Therefore, traffic stops must satisfy the Fourth Amendment's reasonableness limitation, which 'requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity.'" *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) (quoting *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir.2009)).

Defendant asserts Officer Gonzalez effectuated two unlawful seizures. First, when he parked his police cruiser directly in front of the blue sedan and placed a Stop Stick under one of the blue sedan's tires, and second, when he opened the vehicle door without Defendant's consent. Defendant challenges the seizure of the firearm and ammunition as a "fruit of the poisonous tree." *See Tisdale v. Hartley*, 442 F. Supp. 3d 569, 573 (W.D.N.Y. 2020) ("[T]he 'fruit of the poisonous tree doctrine[]' . . . is 'an extension of the long-recognized exclusionary rule' and 'excludes evidence obtained from or as a consequence of lawless official acts.'") (quoting *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999)).

The government concedes that Officer Gonzalez seized Defendant, but contends he had a reasonable suspicion that Defendant was engaged in criminal activity and that, for officer safety purposes, it was reasonable for Officer Gonzalez to open the driver's side door. Alternatively, the government argues the seizures were permissible pursuant to the community caretaking exception to the warrant requirement or the inevitable discovery doctrine.

### C.    Whether Officer Gonzalez Unlawfully Seized Defendant By Parking His Cruiser in Front of Defendant's Vehicle and Using a Stop Stick.

"[T]he requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment[.]'" *New Jersey v. T.L.O.*, 469 U.S. 325, 346 (1985) (quoting *Hill*

*v. California*, 401 U.S. 797, 804 (1971)). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause[.]" *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal citations and quotation marks omitted).

A reasonable suspicion must be based on specific and articulable facts, as viewed through the lens of an experienced law enforcement officer. *United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020). When assessing reasonableness, "it is imperative that the facts be judged against an objective standard[.]" *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Courts must therefore ask whether "the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate[.]" *Id.* at 21-22 (quoting *Carroll v. United States*, 267 U.S. 132 (1925); *Beck v. State of Ohio*, 379 U.S. 89, 96-97 (1964)). The Supreme Court has "consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct." *Navarette*, 572 U.S. at 403 (internal citations and quotation marks omitted). The standard permits law enforcement officers "to make commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 589 U.S. 376, 376 (2020) (internal quotation marks omitted) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

As he was driving through the Fletcher Free Library parking lot, Officer Gonzalez observed a stationary vehicle with its engine running. Although he could not see clearly into the vehicle because the windows were fogged, he was able to see several people inside the vehicle whom he believed may be overdosing. "Based upon the totality of these circumstances viewed in the context of [Officer Gonzalez's] experience and training," *Dobson v. Doughtery*, 2020 WL 8167269, at *10 (W.D.N.Y Sept. 23, 2020), it was reasonable for him to conclude that the operator and the vehicle occupants were under the influence of illegal narcotics and that the operator either had operated or intended to operate the vehicle in that condition. *See Navarette,* 572 U.S. at 403 (affirming finding of reasonable suspicion of impaired driving based only on a single

report of driver running another vehicle off the highway because "[t]hat conduct b[ore] too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness[]").[4]

Officer Gonzalez parked his police cruiser and used a Stop Stick to impede the vehicle's ability to flee until he had an opportunity to investigate further.[5] Officer Gonzalez credibly testified that it was not uncommon for operators of vehicles to flee from traffic stops and other seizures for a variety of reasons and endanger officer safety in doing so. It was therefore reasonable for him to take measures to ensure the blue sedan did not flee in the midst of his investigation. As a result, there was no Fourth Amendment violation in the manner in which Officer Gonzalez parked his vehicle or in his use of a Stop Stick.

The government alternatively contends that Officer Gonzalez's actions were lawful under the community caretaking exception. "[P]olice officers often act in a 'community caretaking' capacity, fulfilling a public safety role that is 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *United States v. Touzel*, 409 F. Supp. 2d 511, 519 (D. Vt. 2006) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)); *see also Caniglia v. Strom*, 593 U.S. 194, 196 (2021) ("[P]olice officers who patrol the 'public highways' are often called to discharge noncriminal 'community caretaking functions,' such as responding to disabled vehicles or investigating accidents.") (quoting *Cady*, 413 U.S. at 441).

---

[4] Under Vermont law, it is unlawful to possess any amount of certain controlled substances, including illegal opiates. *See* 18 V.S.A. §§ 4231-35. It is also unlawful to operate a motor vehicle with the slightest degree of impairment. *See* 23 V.S.A. § 1201; 23 V.S.A. § 4(1).

[5] In his briefing and at the evidentiary hearing, Defendant challenged the government's argument that Officer Gonzalez had reasonable suspicion that Defendant was driving under the influence of controlled substances or possessed illegal narcotics in light of Officer Gonzalez's concession that he approached the vehicle to check on the welfare of the occupants. The Supreme Court, however, "has long rejected any attempt to inject subjectivity into the Fourth Amendment context. The Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent of the officer." *United States v. Weaver*, 9 F.4th 129, 145 (2d Cir. 2021) (alterations adopted) (emphasis in original) (footnotes and internal quotation marks omitted) (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)).

Accordingly, "[w]hen an intrusion on privacy is a valid exercise of the community caretaking function, it may be reasonable even if the officer has no probable cause to suspect a violation." *Touzel*, 409 F. Supp. 2d at 519 (citing *Cady*, 413 U.S. at 447-48).

Based on his training and experience, Officer Gonzalez reasonably believed that the operator of the blue sedan was unconscious and potentially overdosing or suffering from a medical event. He further reasonably believed that other occupants of the vehicle may be overdosing as well. For this reason, he radioed the Fire Department to request medical assistance. Assuming arguendo that Officer Gonzalez lacked a reasonable suspicion that the vehicle occupants were engaged in illegal activity, the seizure remained objectively reasonable under the community caretaking exception. *See, e.g.*, *Winters v. Adams*, 254 F.3d 758, 761, 766 (8th Cir. 2001) (finding law enforcement officers "were reasonable in their beliefs that [the community caretaking function] permitted them to briefly detain and investigate the identity and circumstances" of an individual they believed "ingested or used some type of illegal drug and maybe used too much and was overdosing[]") (citation and internal quotation marks omitted).[6]

For the foregoing reasons, Defendant's motion to suppress based on Officer Gonzalez's parking of his police cruiser and use of a Stop Stick is DENIED.

### D.    Whether Officer Gonzalez Unlawfully Seized Defendant When He Opened the Door Without Defendant's Consent.

Defendant contends Officer Gonzalez violated the Fourth Amendment when he opened the operator's door to the blue sedan without Defendant's consent after Defendant had complied with his request to turn off the engine. "The touchstone of [a court's]

---

[6] *See also United States v. Garner*, 416 F.3d 1208, 1215 (10th Cir. 2005) (concluding "the government's interest in community caretaking outweighed [defendant]'s interest in being free from arbitrary interference[]" where defendant "appeared unconscious[]" and "might well have needed medical assistance[]") (citing *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992)); *United States v. Koger*, 152 F. App'x 429, 430-31 (6th Cir. 2005) (per curiam) (affirming magistrate judge's finding adopted by the district court that "as a 'community caretaker' [a law enforcement officer], after noticing a seemingly unconscious occupant parked late at night on a desolate stretch of road, had the authority . . . to investigate by approaching the defendant's car under the reasonable fear that the apparently unconscious occupant was either in danger . . . or was impaired such that upon awaking and driving, he could constitute a danger to others[]").

9

analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (quoting *Terry*, 392 U.S. at 19). Whether a law enforcement officer's actions are reasonable depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

The Supreme Court has recognized that "the safety of the officer[] is both legitimate and weighty" and has acknowledged "the inordinate risk confronting an officer as he [or she] approaches a person seated in an automobile." *Mimms*, 434 U.S. at 110. The Court has also stressed that "[t]he risk of harm to both the police and the occupants of a stopped vehicle is minimized . . . if the officers routinely exercise unquestioned command of the situation." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (internal quotation marks and brackets omitted) (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)).

When Officer Gonzalez opened the door to the blue sedan, he did so because he could not see clearly into the vehicle and because he was concerned for officer safety as well as the occupants' well-being. The opening of the car door, arguably a *de minimis* intrusion, allowed him to better determine the condition of the driver and his passengers. In addition, in light of Defendant's belligerent and non-compliant behavior, there was an objectively reasonable suspicion that Defendant "might be armed [or] presently dangerous." *Mimms*, 434 U.S. at 112. Based on the totality of the circumstances, the second seizure did not violate the Fourth Amendment because it was a reasonable response to legitimate officer safety concerns and necessary to further investigate the welfare of the vehicle's occupants. *See Johnson*, 555 U.S. at 331 (finding "[t]he government's 'legitimate and weighty' interest in officer safety . . . outweigh[ed] the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle[]").

When the door to the blue sedan was opened, the Defendant confirmed that he was recovering from an overdose. Another officer advised Officer Gonzalez that the blue sedan was stolen. At that point, Officer Gonzalez had probable cause to arrest Defendant not only in connection with the stolen vehicle but for operating a vehicle while impaired and possession of controlled substances. *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) ("An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime.") (alteration in original) (internal quotation marks omitted) (quoting *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)).

Officer Gonzalez lawfully ordered Defendant to exit the vehicle, and Defendant complied. After Defendant exited the blue sedan, Officer Gonzalez saw a firearm and ammunition in the driver's seat in plain view. *See United States v. Garro*, 2025 WL 1880390, at *3 (D. Conn. July 8, 2025) ("Under the plain-view exception, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.") (internal quotation marks omitted) (quoting *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017)). There was thus no Fourth Amendment violation in law enforcement's seizure of the firearm and ammunition.

The government argues that even if Officer Gonzalez did not act reasonably in opening the blue sedan's door, Defendant's motion to suppress should be denied pursuant to the inevitable discovery doctrine.

> The inevitable discovery doctrine instructs that "'evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation.'" *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 102 (2d Cir. 2016) (quoting *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006)).

> \* \* \*

> [T]he inevitable discovery doctrine requires that the means by which the evidence would inevitably be discovered is independent from the means by

11

which the evidence was actually—and unlawfully—discovered. Consistent with this principle, the investigation supporting a claim of inevitable discovery cannot itself have occurred only because the misconduct resulting in actual discovery was exposed. . . .

[T]he inevitable discovery doctrine does not apply simply because "a reasonable police officer *could have*" lawfully discovered the evidence at issue; rather, it applies where the record establishes "with a sufficiently high degree of certainty that a reasonable police officer *would have*" lawfully discovered the evidence regardless of the disclosure of any legal defect in the actual discovery of the evidence. *United States v. Heath*, 455 F.3d at 58 (emphases in original).

*United States v. Lauria*, 70 F.4th 106, 122-23 (2d Cir. 2023). "The government bears the burden of proving inevitable discovery by a preponderance of the evidence." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Cabassa*, 62 F.3d 470, 472-73 (2d Cir. 1995)).

After Officer Gonzalez discovered the blue sedan was stolen, in accordance with BPD's policy, he would have notified the vehicle's registered owner and inventoried the vehicle. "An inventory search pursuant to standardized procedures will be upheld unless there is a showing that the government acted in bad faith or searched the car for the sole purpose of investigation." *United States v. Arango-Correa*, 851 F.2d 54, 59 (2d Cir. 1988). *See United States v. Zimmerman*, 480 F. Supp. 3d 446, 454 (E.D.N.Y. 2020) (denying defendant's motion to suppress where "the inventory search was conducted pursuant to established procedures set forth in the [New York Police Department] Patrol Guide") (citation omitted). Here, there is no evidence of bad faith or a pretextual search.

Even without BPD's policy regarding stolen vehicles, when a law enforcement officer "lawfully arrests 'the occupant of an automobile, he [or she] may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile' and any containers therein." *Arizona v. Gant*, 556 U.S. 332, 340-41 (2009) (quoting *New York v. Belton*, 453 U.S. 454, 460 (1981)). Such a search is permissible "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351.

12

"Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 127 (2d Cir. 2024) (internal quotation marks omitted) (quoting *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004)). Because there was probable cause to believe the blue sedan was stolen and contained evidence of illegal drugs, Officer Gonzalez was entitled to search the passenger compartment of the sedan for evidence of the crimes of arrest. In that search, he would have inevitably found the firearm and ammunition. The inevitable discovery doctrine thus provides an alternative ground for denying the motion to suppress.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to suppress and, in turn, DENIES his motion to dismiss the Indictment for lack of admissible evidence. (Doc. 31.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 24th day of July, 2025.

Christina Reiss, Chief Judge
United States District Court

13